## BATTLE v. ADAMS.    (No. 642.)

(Court of Civil Appeals of Texas. Beaumont. Feb. 23, 1921. Rehearing Denied March 23, 1921.)

1. **Mines and minerals**  77, 78(7)—**Forfeiture or abandonment of lease not question for court when facts in dispute.**

Usually it is a question for the jury whether there has been a forfeiture or abandonment of an oil lease, and, when there is a dispute as to the acts done, the court should not determine the question as a matter of law.

2. **Mines and minerals**  78(7) — **Evidence held to make questions of fact as to whether well was drilled under contract with lessee and secured by him.**

In a suit to cancel an oil lease providing that it should terminate if no well was commenced within 200 feet of the lessor's lands on or before a specified date, evidence held to make questions of fact for the jury as to whether a well drilled within the required distance by a third party was drilled under a con-

tract with the lessee, and whether the lessee secured the drilling of the well.

**3. Mines and minerals ⬅️78(1)—Lease complied with by procuring drilling of well by one not an assignee of the lease.**

An oil lease expressly authorizing an assignment, and providing for termination unless a well was commenced within 200 feet of the lands before a specified date, was complied with where a corporation to which the lessee turned over adjoining lands in payment for stock was induced by the lessee to drill within the required distance for the purpose of carrying out the contract, though the corporation was not an assignee of the lease in question.

**4. Mines and minerals ⬅️78(1)—Lease complied with by procuring drilling of well whether contract made before or after date of lease.**

An oil lease requiring a well to be commenced within 200 feet of the lessor's lands before a specified date was complied with if the lessee induced or procured a third party to drill a well within the required distance for the purpose of carrying out the contract, whether his contract with the third person was made before or after the execution of the lease.

Appeal from District Court, Panola County; Chas. L. Brachfield, Judge.

Suit by T. C. Adams against O. M. Battle. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

Woolworth & Duran, of Carthage, and F. H. Prendergast, of Marshall, for appellant.

Jones, Sexton, Casey & Jones, of Marshall, for appellee.

O'QUINN, J. This suit was brought by appellee, T. C. Adams, against appellant, O. M. Battle, to cancel an oil lease executed by appellee to appellant on June 12, 1919, on 904 acres of land situated in Panola county, Tex.

The substance of plaintiff's petition is that the lease was procured by fraud; that the purpose and consideration of the lease was to develop the said lands for oil, gas, and other minerals; that defendant had wholly failed to comply with the provisions of the lease, and that same was terminated; and prayed for judgment canceling same. Defendant answered, denying the allegations in plaintiff's petition, and said he had complied with all the terms, obligations, and requirements in said lease, and had performed all the covenants stipulated and obligations contained in said lease and within the time therein required.

Among other stipulations not necessary to the determination of the questions involved, the lease contained the following:

"If no well be commenced on the lands described herein nor within 200 feet of any lands owned by the lessor, on or before the 15th day of August, 1919, this lease shall fully terminate as to both parties hereto, and it is agreed and understood that, after the commencement of operations of the drilling of the said first well, the same must be continued with due diligence."

There was also a clause expressly allowing the contract to be assigned by either party in whole or in part.

Upon the conclusion of the testimony, the court peremptorily instructed a verdict for the plaintiff, appellee; the charge being as follows:

"Gentlemen of the jury, the court, in view of the testimony in this case, is of the opinion that the uncontroverted testimony shows that the lease has been forfeited by the failure to comply with the stipulations in the lease that a well will be commenced upon the land owned by the lessor or within 200 feet of same, for the reason that the defendant had obtained an agreement from the Hope Oil Company to drill a well, where it was drilled, before he obtained the lease from Adams, and did nothing thereafter."

Judgment was accordingly entered for plaintiff, canceling the lease, from which judgment the defendant has appealed.

The testimony shows that a well was drilled by the Hope Oil Company within 200 feet of plaintiff's lands, and within the time specified in the lease.

The court's charge was based upon the following testimony from the record:

O. M. Battle, appellant, testified, substantially, as follows:

"The first time that I met Mr. Adams, that I am certain about, was on the morning of the 23d of May, last year, in his field; I met Mr. Adams in the presence of Dewitt Furrh, Mr. Littlejohn, and Mr. Tiller. Before that time I had acquired a lease on some acreage of the Louis Werner Sawmill Company, approximately 2,000 acres. I went to see Mr. Adams on the 23d of May because he had a lease of probably a couple of thousand acres held by the Gulf Refining Company that I just learned had been forfeited for nonpayment of rentals. When Mr. Timmons and Mr. Furrh and I went to see Mr. Adams, there was an agreement entered into between us with reference to the procurement of additional acreage over there. He said he would give us 1,000 acres in lease and help us secure other acreage. The proposition from Mr. Furrh and myself to Mr. Adams was that we could get as much as 3,000 acres, the minimum was placed at 3,000 acres, to get a well. In that conversation with Mr. Adams there was no one designated to drill the well. As a matter of fact, if I could secure the well for them in that locality, the acreage was to be made to me. With regard to the lease from the Louis Werner Sawmill Company to the Hope Oil Company, that lease was originally made to me. I got the lease made at my order to the Hope Oil Company. I got from the Hope Oil Company $5,000 in stock for my associates and myself for the Louis Werner lease that I had paid $5,000 cash for, and I am now a stockholder in the Hope Oil Company, and have been since its organization. At

the time I began negotiations with Timmons and Furrh the Hope Oil Company was not in existence. They (the Hope Oil Company) invited me and asked me to come in with them. That they would drill their acreage over close to Minden and would promptly drill mine over in Panola county. Adams, Timmons, Furrh, and I procured somewhere between 3,000 and 4,000 acres in leases between the 23d of May and 12th of June.

"My agreement with them, on the 23d of May, when I first talked to them of getting up this acreage, was this: That I, having owned the Louis Werner acreage, being the owner of the Louis Werner acreage, would secure development, that is, the drilling of a well somewhere in that neighborhood, and that as the Louis Werner lease was strictly a drilling obligation, that the well, of course, would have to be drilled on the Louis Werner acreage, and that if they would come in and help me get this 3,000 acres for myself, which was to replace the acreage already owned by me, that I was to give to secure the drilling of a well in that locality; that all above 3,000 acres we would go in together on a profit-sharing plan. I assisted in procuring the well to be drilled in that vicinity. As to the interest I had in the procurement of the drilling of a well on the Louis Werner acreage, the point of interest with me was the securement of acreage for my own protection, and to get a well in there, of course, on the best terms I could. I made the trade or bargain with the Hope Oil Company to drill on the Louis Werner lease that I owned at that time, (and which the testimony showed adjoined appellee Adams' land). There was nothing said about the place where the well was to be drilled; it was understood at the outset. Mr. Secrest, who was the general manager of the Hope Oil Company, was an associate of mine in the Louis Werner lease, and as general manager of the Hope Oil Company the point was understood and agreed upon with reference to where this well should be drilled. The well was drilled at the point where Mr. Secrest agreed it would be drilled. When the location of that well was selected, I was along. Mr. Secrest was there, and Mr. Gibbons, the head driller of the Hope Oil Company, and Mr. Adams was along, and I think that Mr. Carpenter, of the Louis Werner Company, was there. The location was made before the 12th of June, the date of the Adams lease, but was known only to Mr. Secrest and myself, and probably one or two others, but not to any one else prior to the lease of Mr. Adams. Later I was there when it was laid out, so to speak, and definitely settled where the well would be drilled. That was about the middle of July. When I met Mr. Adams the first time I still held the Werner lease of 2,000 acres of land, and Mr. Adams became acquainted with the fact that I held that lease at that time. The purpose of organizing the Hope Oil Company was for the drilling for gas and oil in Webster parish, La., and in Panola county, Tex., and the Panola county holdings was the Louis Werner lease that I had."

E. C. Brown, witness for plaintiff and secretary of the Hope Oil Company, testified:

"I am secretary of the Hope Oil Company, and have been ever since it was organized. Mr. A. L. Betts is president of the company. We first drilled a well in Louisiana, and when we completed that well we moved our rig through the country into Texas. We got our Panola county holdings from the Louis Werner Sawmill Company, through Mr. Battle. Mr. Battle had the leases and we had these leases in Louisiana, and we pooled our leases. We gave Battle $5,000 in stock of the Hope Oil Company for the Werner lease. Battle is a stockholder in the Hope Oil Company. We did not purchase any other holdings in Panola county. We had an agreement with Battle that when we drilled the well in Louisiana we would come over here and drill a well on the 2,000 acres in Texas. We were to begin drilling in Texas by 15th of November, but we began some time in August."

A. L. Betts, witness for plaintiff, testified:

"I am president of the Hope Oil Company. Battle and associates had this Louis Werner 2,000 acres. We took it in on the basis of $5,000, and paid for it in Hope Oil Company stock."

Warren Gibbons, witness for defendant, testified:

"I live in Shreveport. I have done some work for the Hope Oil Company. I did some work for them in Panola county, Tex., beginning about the 5th day of August. I know where Mr. Adams lives. That work was done about 50 feet north of what I understood to be Mr. Adams' line. On the 5th of August I took the first men out to do the work, and the first drilling was done on the 12th of August, 1919. I was present when the location was made for the drilling of that well. As to who was present and located it, Mr. Secrest, Mr. Battle, Mr. Dosher, and myself were present."

[1] Usually whether or not there has been a forfeiture or abandonment of a lease is a question for the jury. Where there is a dispute as to the acts done, it is not for the court to determine as a matter of law, but the question is one for the jury to decide in connection with the testimony. 1 Thornton's Law of Oil and Gas, § 211, p. 341, and cases cited; Forney v. Ward, 25 Tex. Civ. App. 443, 62 S. W. 108.

[2] We think the above testimony raises the following issues of fact to be found by the jury:

(1) That the well was drilled by the Hope Oil Company under a contract with Battle. This appears clearly from the testimony of E. C. Brown, secretary of the Hope Oil Company, as shown above. He said:

"We had an agreement with Battle that when we drilled the well in Louisiana we would come over here and drill a well on the 2,000 acres in Texas. We were to begin drilling in Texas by the 15th of November, but we began some time in August."

(2) That Battle secured the drilling of the well within 200 feet of Adams' lands, and within the time stipulated in the lease. Battle testified:

"I made a trade with the Hope Oil Company to drill on the Louis Werner lease that I owned at that time. There was nothing said about the place where the well was to be drilled. It was understood at the outset. Mr. Secrest, who was general manager of the Hope Oil Company, was an associate of mine in the Louis Werner lease, and as general manager of the Hope Oil Company the point was understood and agreed upon with reference to where the well should be drilled. The well was drilled at the point where Mr. Secrest agreed it would be drilled. When the location of that well was selected, I was along, Mr. Secrest was there, and Gibbons, the head driller of the Hope Oil Company, and Mr. Adams was along. Later I was there when it was laid out, so to speak, and definitely settled where the well would be drilled. That was about the middle of July."

No question is made as to the drilling of the well, nor as to its not being within the distance and within the time stipulated in the lease.

It is also our opinion, from the construction of the testimony, that Battle was instrumental in securing the drilling of the well at the place and within the time stipulated in the lease, after he secured the lease from Adams. It is true he originally contracted with the Louis Werner Sawmill Company to drill on the Werner land by the 15th of November, but such contract and drilling would not have saved his lease from Adams. After securing the lease from Adams, he went upon the ground with the general manager of the Hope Oil Company, Secrest, and Gibbons, their head driller, Adams being present, too, and assisted in definitely selecting the spot where the well was to be put down, and it was drilled at that place. He testified:

"When the location of that well was selected, I was along, Secrest was there, and Gibbons, the head driller of the Hope Oil Company, and Adams was along. I was there when it was laid out, so to speak, and definitely settled where the well would be drilled. That was about the middle of July."

This testimony is uncontroverted, and was "something done" by him after his contract with Adams, and hence the court was in error in finding, as announced in his charge to the jury, that the well was drilled at the time and place shown in the record, under a contract made prior to June 12th.

It is our view of the law of this case that Battle's lease contract with Adams was not subject to forfeiture under the drilling clause of the lease, as copied above, provided, after he secured the lease from Adams, and in view of and for the purpose of carrying out his contract with Adams, he induced the Hope. Oil Company to drill the well where it was drilled and at the time it was drilled. Adams was not interested in . the consideration paid by Battle to the Hope Oil Company to drill the well, but he (Adams) had contracted for a well to be drilled by Battle or through his efforts. The testimony showing that this became an issue of fact, it follows that the court erred in instructing a verdict, but should have submitted the issue to the jury for their finding.

It is apparent that the primary purpose on the part of appellee was to have the land explored for the purpose of ascertaining the existence of minerals thereunder, and to obtain the benefits from the development. This was the real consideration for the grant. The court having instructed a verdict for appellee on the ground that the lease had been forfeited by the failure of appellant to comply with the stipulations in the lease that a well should be commenced on the lands described in the lease, or within 200 feet of same, by the 15th day of August, 1919, for the reason that defendant had obtained an agreement from the Hope Oil Company to drill a well where it was drilled, before he obtained the lease from appellee, and did nothing thereafter, takes the other questions out of the case, and it is before us on the one question of whether appellant complied with the drilling stipulation above quoted, or was the lease forfeited by his failure to do so.

It is evident that the appellee did not contract for the personal performance of appellant, for the lease contained a special clause allowing assignment of the contract by either party, either in whole or in part. But appellee contends that it should have been done either by appellant or by some one holding under him by assignment of the lease; that the Hope Oil Company, having drilled the well and not having the lease by assignment, was a stranger, and the drilling a chance operation. Appellant contends that he induced the Hope Oil Company to do the drilling, and that it was through his efforts that the well was located and drilled at the time and the spot where it was drilled; and that this was done in view of and for the purpose of carrying out his contract with appellee. That being the state of the record, as we construe it, we think the court erred in taking the case from the jury, but should have submitted this issue to the jury under appropriate instructions, as a fact for them to find from the evidence.

[3] Appellee contends that if it had been shown in fact that the Hope Oil Company was induced by appellant, before or after the execution of the lease by appellee to appellant, to drill the well within 200 feet of appellee's land, and within the time stipulated by the lease, it would not be such compliance with the drilling contract as to prevent forfeiture; his contention being that appellant must have drilled the well himself, or must have assigned the lease and the assignee have done so under the lease. We cannot agree to this contention. We hold that if appellant, either himself or by some one procured by him to do so, drilled the

well, and that same was done in view of and for the purpose of carrying out his contract with appellee, it is in compliance with the very terms of the contract; it being admitted that the well was drilled within 200 feet of appellee's lands, and within the time stipulated. In other words, we hold that if appellant induced or procured the Hope Oil Company to drill the well where it was drilled, and at the time it was drilled, and that this was done in view of and for the purpose of carrying out his contract with appellee, then it is a compliance with the drilling terms of the lease above quoted.

[4] The contention is made by appellee that, if appellant did induce or procure the Hope Oil Company to drill the well at the time and place same was drilled, the agreement or understanding of appellant with the Hope Oil Company for said drilling was had and made before the lease was executed by appellee to appellant, and hence of no avail. We do not accept this as a sound proposition of law on the facts. As we construe the facts, appellant secured the drilling of the well by the Hope Oil Company at the place and within the time stipulated in the lease contract, after his contract with appellee. However, we do not consider the time of the making the agreement by appellant with the Hope Oil Company to drill said well as controlling. If in fact appellant did induce or procure the Hope Oil Company to drill the well at the time and place it was drilled, and this was in view of and for the purpose of carrying out his contract with appellee, that would be a full compliance with his contract. Appellant having the right, under the law, to contract with others for the drilling of the well, the date of his so contracting was not a matter of interest to appellee, his right being to have the well drilled within the time and at the place stipulated, and if this has been done by appellant, or through his procurement, as above held, then the full measure of appellee's rights have been met, and in order to do this appellant was not bound to assign his lease to the party he induced or procured to do the drilling.

For the errors indicated, the judgment is reversed and the cause remanded.

Reversed and remanded.

WALKER, J. I concur in this opinion to the extent that the testimony raises the two issues of fact stated on the fifth page [see 229 S. W. 932, column 2] and the statement of law of the case, as given in the paragraph on the seventh page [see 229 S. W. 933, column 1], beginning:

"It is our view of the law of this case that Battle's lease contract with Adams was not subject to forfeiture under the drilling clause of the lease, as copied above," etc.